UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

SHELITA TUCKER                                              CIVIL ACTION

VERSUS

UNITED PARCEL SERVICE                           NO. 15-00611-JJB-RLB

## RULING

Before the Court is a *Motion for Summary Judgment* filed on behalf of the
Defendant, United Parcel Service, Inc. ("UPS").[1]  Plaintiff Shelita Tucker ("Tucker") has
filed an *Opposition*[2] to which UPS has filed a *Reply*.[3]  The Court's jurisdiction exists
pursuant to 28 U.S.C. § 1331.  Oral argument is unnecessary.  For the following reasons,
the Defendant's *Motion* is GRANTED.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Tucker brings this employment discrimination lawsuit against her former employer
UPS.   Tucker worked for UPS from November 2006 until October 30, 2014 in the Port
Allen Facility, in various supervisory positions.[4]  In her position, Tucker had the authority
to discipline her subordinates, who were all bargaining union employees, including Larry
McCaleb ("McCaleb").[5]   A veteran employee of UPS who had worked there for over 27
years, McCaleb was a bargaining unit employee who held the position of car washer, and
also served as a union steward.[6]  As a car washer, McCaleb's primary job was to wash
package cars and unload them if necessary.[7]   As a union steward, McCaleb had filed

---

[1] Doc. 24.
[2] Doc. 33.
[3] Doc. 34.
[4] Doc. 24-1, p. 4; Doc. 24-2, p. 26.
[5] Doc. 24-1, pp. 11 and 13-14.
[6] Doc. 24-1, p. 13; Doc. 24-11, p. 2; Doc. 24-11, p. 23.
[7] Doc. 24-11, p. 2.

several grievances against Tucker.[8]  McCaleb had also accused Tucker of harassing him.[9]  As McCaleb's supervisor, Tucker reported him for disciplinary issues on several occasions.[10]

Beginning in August 2012 until October 2014, Tucker claims she was subjected to sexually offensive and unwelcome conduct by her subordinate McCaleb.[11]  She claims that he would smile at her, make inappropriate comments towards her, hide and scare her, and operate UPS vehicles inappropriately around her.  Then, on July 24, 2014, an incident occurred involving Tucker and McCaleb on a packing truck.[12]

Tucker saw several package cars that needed to be unloaded.[13]  Although it was not her role to unload package cars, because she did not see any of her subordinates around, Tucker decided to enter the package car and begin unloading packages.[14]  McCaleb, a bargaining unit employee who could unload packages, then entered the package car and told Tucker he would take over for her.[15]  In response, Tucker told McCaleb to go and unload another package car.[16]  According to Tucker, she turned away from McCaleb and continued unloading packages.[17]  Shortly thereafter, Tucker claims that McCaleb, who was fully clothed, walked up behind her and pressed his penis against her backside.[18]  Tucker immediately turned around, pointed her finger in McCaleb's face

---

[8] Doc. 24-11, p. 4-5; Doc. 24-1, pp. 23-24.
[9] Doc. 24-7, p. 3.
[10] Doc. 24-1, pp. 16-17; pp. 34-36; Doc. 24-8, pp. 5-7.
[11] Doc. 1, ¶6, pp. 2-4; Doc. 24-11, pp. 4-5; Doc. 24-1, pp. 23-24.
[12] Doc. 24-1, p. 38.
[13] Doc. 24-1, 40.
[14] Doc. 24-1, pp. 41-42.
[15] Doc. 24-1, p. 43.
[16] Doc. 24-1, p. 43.
[17] Doc. 24-1, p. 46.
[18] Doc. 24-1, pp. 46-47 (Tucker testified that she "felt [McCaleb's] private parts on [her] butt.").

and told him "You better back off of me. You better back off of me right now."[19]  McCaleb put his hands in the air, said "okay," and left the package car.[20]

After exiting the package car, Tucker encountered Terry Burns ("Burns"), and told him what had happened.[21]  Tucker then proceeded to the office of the Center's Business Manager, Darin Williams ("Darin"), to report the incident, but because other employees were in his office and she was upset, Tucker went to the bathroom to get herself together.[22]  Another supervisor, Renicca Wolfe ("Wolfe"), came in to check on Tucker; however, Tucker did not tell her what had happened.[23]  Thereafter, Tucker immediately reported the incident to Darin and provided a written statement of what had transpired.[24]  When asked if she would like to leave for the day, Tucker replied in the affirmative.[25]  The next day when she arrived for work, Tucker was told to call her supervisor Jermaine Collins ("Collins").[26]  Collins informed Tucker that she needed to stay home.[27]  Tucker then called Darin and asked why she could not work.[28]  Darin informed her that he could not stop McCaleb from working that day and Williams did not want Tucker to have to work with him.[29]  Therefore, Darin told Tucker to take the day off with pay.[30]  Later this same day, Tucker filed a complaint with UPS' Compliance Line.[31]  Wilfred Edwards ("Edwards"), the Area Human Resources Manager, received the complaint on Monday, July 28, 2014,

---

[19] Doc. 24-1, p. 48.
[20] Doc. 24-1, pp. 49 and 50.
[21] Doc. 33-2, p. 53.
[22] Doc. 33-2, p. 56.
[23] Doc. 33-2, p. 57.
[24] Doc. 24-2, pp. 7 and 9.
[25] Doc. 24-2, p. 9.
[26] Doc. 24-2, p. 11.
[27] Doc. 24-2, p. 11.
[28] Doc. 24-2, p. 11.
[29] Doc. 24-2, p. 14.
[30] Doc. 24-2, p. 12.
[31] Doc. 24-1, p. 28.

and, on that same day, assigned its investigation to Shraya Williams ("Williams"), Human Resources Supervisor. UPS initiated an investigation into Tucker's complaint the following week, while Tucker was on vacation.[32] While Tucker was out on vacation, she also reported the incident to the Port Allen Police Department.[33]

Williams spoke with Tucker on August 4, 2014, when she returned from vacation.[34] During the interview, Tucker relayed her version of events and explained that she and McCaleb were the only two individuals present during the incident.[35] Tucker also claimed that McCaleb had made other sexual comments and advances toward other female employees in the past.[36] As part of her investigation, Williams interviewed six female employees at the UPS facility who came into contact with McCaleb on a regular basis.[37] Two of the women denied having any problems with McCaleb.[38] The other women claimed that McCaleb had made sexually inappropriate comments or stared at them in a "creepy" way in the past.[39] However, none of the women claimed that McCaleb had ever physically touched them.[40]

Williams never interviewed or received a written statement from McCaleb about the incident.[41] At the time Williams began her investigation, McCaleb had been taken out of service, or suspended without pay, pending the outcome of the investigation.[42]

---

[32] Shraya Williams attempted to contact Tucker by phone beginning on July 28, 2014 without any success. Doc. 24-2, pp. 15-17.
[33] Doc. 33-2, pp. 49 and 138.
[34] Doc. 24-10, p. 6; Doc. 33-6, pp. 43-44.
[35] Doc. 24-10, pp. 20-21.
[36] Doc. 24-8, p. 11; Doc. 24-9, pp. 1-4.
[37] Doc. 24-10, p. 10; Doc. 33-6, pp. 43-44.
[38] Doc. 24-10, p. 18; Doc. 33-6, p. 46.
[39] Doc. 33-6, pp. 18-23; and 45-48.
[40] Doc. 33-6, pp. 43-49.
[41] Doc. 24-10, p. 5.
[42] Doc. 24-10, p. 5; Doc. 24-11, p. 17; Doc. 24-12, p. 18.

Because Darin had obtained a statement from McCaleb on the night of the incident, Williams relied on the business manager's account.[43]  McCaleb had told Darin that he had bumped into Tucker inside of the car, and it was an unintentional accident.[44]

Ultimately, given Tucker and McCaleb's conflicting accounts of the July 24, 2014 incident, Williams was unable to validate Tucker's claims that McCaleb had acted intentionally.[45]  Accordingly, UPS could not terminate McCaleb.[46]  Therefore, McCaleb was allowed to return to work on August, 12, 2014.[47]  Upon his return, UPS met with McCaleb and spoke to him about the allegations, the investigation, and "UPS' expectation as it pertains to professionalism and harassment in the workplace."[48]  UPS wanted to take corrective action to make sure he understood UPS policies as they pertained to "workplace violence, professionalism, [and] harassment in the workplace."[49]  McCaleb was also instructed that he could only work in certain areas, and not to go into Tucker's work area.[50]

August 12, 2014, was the first day that both Tucker and McCaleb were working back at the UPS facility since the July 24, 2014 incident.  On that day, Tucker emailed Edwards and told him that she was still afraid of McCaleb and uncomfortable working around him.[51]  In response, UPS offered her options to change working shifts, and

---

[43] Doc. 24-10, p. 5.
[44] Doc. 24-10, p. 6.
[45] Doc. 24-10, p. 21.  Doc. 24-12, p. 19. (According to Edwards, "[t]here was insufficient evidence to show that the incident actually took place."); p. 25 (Edwards also denied that there needed to be a witness to the harassment in order to decide discipline was necessary; he testified that several members of the Labor Department were reviewing the evidence collected in this case.).
[46] Doc. 24-12, p. 17.
[47] Doc. 24-11, p. 27; Doc. 24-9, p. 3. McCaleb also grieved his suspension with the Union in order to be reimbursed payment for the time he was out without pay.
[48] Doc. 24-12, p. 7.
[49] Doc. 24-12, p. 22.
[50] Doc. 24-11, pp. 20 and 22.
[51] Doc. 24-8, p. 10.

facilities.[52]  Tucker turned down these positions for various reasons.[53]  In an effort to make Tucker feel more comfortable, Williams even had people walk her to her car at the end of a sort.[54]

Subsequently, Tucker emailed Collins and Edwards about McCaleb staring at her, lurking by the guard shack, and how this made her feel uncomfortable.[55]  In an effort to keep McCaleb from being in her presence, Tucker's supervisor moved her to several different locations in the facility.[56]  Edwards also came to the facility to investigate her complaints.  After speaking with Tucker's supervisors to see if there was support for Tucker's claims, Edwards could not corroborate Tucker's claims.[57]  After a meeting with her supervisor and Edwards, Tucker was ultimately assigned to the outbound area.[58] McCaleb was instructed not to go into the outbound area.[59]

In spite of his instructions, on one occasion McCaleb walked near Tucker's work area in outbound.[60]  Tucker immediately reported the incident to her supervisor, and McCaleb was issued discipline for violating management's instructions to remain in his work area.[61]  McCaleb never returned to Tucker's work area again.[62]  In fact, after the July 24, 2014, incident, McCaleb never spoke or touched Tucker again.[63]

---

[52] Doc. 24-2, p. 34; Doc. 24-9, p. 6; Doc. 24-12, p. 16; Doc. 33-6, pp. 42 and 49.
[53] Doc. 24-2, p. 34 (Tucker testified she turned down the pre-load position because she did not want to work the 3:00am-9:00am shift); Doc. 24-2, p. 36 (Tucker turned down one of the Operations Management System's ("OMS") positions because it was on a different time period in the Baker facility.); Doc. 33-2, p. 105 (Tucker turned down another OMS position in the Port Allen facility because such a move would not have helped her to advance her career.).
[54] Doc. 33-6, p. 33.
[55] Doc. 24-9, pp. 5 and 7; Doc. 33-2, p. 82.
[56] Doc. 24-2, pp. 27-29.
[57] Doc. 24-12, p. 8.
[58] Doc. 24-2, p. 29; Doc. 24-9, p. 7; Doc. 33-2, pp. 83 and 91.
[59] Doc. 24-11, p. 22.
[60] Doc. 33-2, p. 94.
[61] Doc. 33-2, pp. 95 and 147; Doc. 24-12, pp. 18-19.
[62] Doc. 33-2, p. 95.
[63] Doc. 33-2, p. 90; Doc. 24-1, p. 50.

On or about October 15, 2014, McCaleb was found guilty of simple battery during a bench trial.[64] McCaleb appealed the verdict.[65] Tucker called in sick to work that evening and was required to submit a write-up for missing work.[66]

Thereafter, on October 30, 2014, Tucker sent an email to Edwards claiming that McCaleb continued to stare at her and place himself in a position where she had to walk past him when she entered and left the building.[67] She further claimed that on the previous day, McCaleb had walked behind her as she exited the center for the night. It is undisputed that Tucker did not return to the UPS facility after October 30, 2014.[68] Tucker testified that over the following weekend she decided not to return to work because "[she] couldn't take it anymore."[69] Instead, Tucker began utilizing her medical leave on November 1, 2014.[70] On February 20, 2015, Tucker officially resigned from UPS because "UPS [had] failed to move her harasser from her place of employment."[71]

Tucker filed an EEOC Charge on January 29, 2015, alleging continuing discrimination beginning on July 24, 2014 and ending on October 31, 2014.[72] On June 24, 2015, the EEOC issued a Notice of Right to Sue (Issued on Request).[73] On September 11, 2015, Tucker filed this federal lawsuit asserting federal and state law claims of sexual harassment, retaliation, and constructive discharge.[74]

---

[64] Doc. 33-2, p. 107; Doc. 24-2, p. 42.
[65] Doc. 24-2, p. 44; Doc. 24-11, p. 3.
[66] Doc. 24-2, pp. 42 and 43; Doc. 33-2, p. 149.
[67] Doc. 24-9, p. 8.
[68] Tucker testified that she was off on Friday, October 31, 2014. Doc. 33-2, p. 113.
[69] Doc. 33-2, p. 113.
[70] Doc. 24-3, p. 2.
[71] Doc. 33-10, p. 2.
[72] Doc. 24-9, p. 9.
[73] Doc. 24-9, p. 10.
[74] Tucker asserted claims under Title VII and La. R.S. 23:301, *et seq.*, and La. R.S. 51:2256. It is undisputed that Plaintiff's counsel withdrew any claim for retaliation under La. R.S. 23:967. Doc. 24-16, p. 1, n.1. Additionally, "[i]n interpreting Louisiana's anti-discrimination law, Louisiana courts look to federal employment discrimination law for guidance and apply the burden-shifting analysis of Title VII of the Civil

## II.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[75]  "An issue is material if its resolution could affect the outcome of the action."[76] "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence."[77]  "A party moving for summary judgment 'must "demonstrate the absence of a genuine issue of material fact," but need not negate the elements of the nonmovant's case.'"[78]  If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[79]  However, the non-moving party's "burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[80]

Rights Act of 1964, 42 U.S.C. Section 2000e." *Mitchell v. Tracer Constr. Co.*, 256 F.Supp.2d 520, 530 (M.D. La. 2003).

[75] Fed. R. Civ. P. 56(a).

[76] *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005)(quoting *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003)).

[77] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008)(citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[78] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D.La. 2003)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986))).

[79] *Rivera v. Houston Independent School Dist.*, 349 F.3d 244, 247 (5th Cir. 2003)(quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)(internal quotations omitted)).

[80] *Willis v. Roche Biomedical Laboratories, Inc.*, 61 F.3d 313, 315 (5th Cir. 1995)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(internal quotations and citations omitted)).

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[81]  The Court must resolve all reasonable factual inferences in favor of the nonmoving party.[82]  However, "[t]he court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[83]  "Conclusory allegations unsupported by specific facts, however, will not prevent an award of summary judgment; 'the plaintiff [can]not rest on his allegations . . . to get to a jury without 'any significant probative evidence tending to support the complaint.'"[84]

## III.    ANALYSIS

### A.    Exhaustion of Administrative Remedies

UPS argues that the allegations of sexual harassment that were not included within the date range on her EEOC Charge (i.e.,  July 24, 2014 through October 30, 2014)  are not properly before the Court because Tucker has not exhausted her administrative remedies with respect to these claims.   It is well-established that a Title VII plaintiff must exhaust her administrative remedies by filing an EEOC Charge before filing a judicial complaint.[85]  Nevertheless, a Title VII action

> may be based, not only upon the specific complaints made by the employee's initial EEOC charge, but also upon any kind of discrimination like or related to the charge's allegations limited only by the scope of the

---

[81] *Pylant v. Hartford Life and Accident Ins. Co.*, 497 F.3d 536, 538 (5th Cir. 2007)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).
[82] *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).
[83] *RSR Corp. v. International Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010)(citing *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)).
[84] *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994)(quoting *Anderson*, 477 U.S. at 249)(citation omitted)).
[85] *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378-79 (5th Cir. 2002).

EEOC investigation that could reasonably be expected to grow out of the initial charges of discrimination.[86]

In her EEOC Charge, Tucker alleges that "[d]uring her employment [she] was subjected to unwelcome sexual harassment" and "subjected to a hostile work environment because UPS made [her] work with [her] harasser."[87]   Here, the scope of any investigation of Tucker's Charge would reasonably include an inquiry into McCaleb's workplace behavior and interactions during the time he and Tucker worked together.   As such, allegations of sexual harassment occurring before the July 24, 2014 date specified in Tucker's EEOC Charge were "within the ambit of a reasonable investigation" into her hostile work environment based on sexual harassment claim.[88]   Further, by including the additional allegations of sexual harassing conduct by McCaleb preceding July 24, 2014 in her *Complaint*, Tucker does not attempt to assert new claims or theories of recovery.[89]   Thus, the Court finds that the allegations of sexual harassment that occurred prior to July 24, 2014, are properly before the Court.

B.     Are Plaintiff's Sexual Harassment Claims Time-Barred?

Pursuant to Title VII, a charge is timely when it is filed with the EEOC within 180 days of the alleged discrimination.[90]   However, because Louisiana is a deferral state, the

---

[86] *Fine v. GAF Chem. Corp.*, 995 F.2d 576, 578 (5th Cir. 1993) (internal citation omitted).  *See also Douglas v. Mortenson Broadcasting Co.*, Civil Action No. 04-2396, 2005 WL 2778538, *2 (N.D. Tex. Oct. 24, 2005)("A Title VII claim is not necessarily restricted to the specifics a plaintiff alleges on the EEOC charge, but rather is limited to the scope of the investigation that can reasonably be expected to grow out of those allegations.").

[87] Doc. 24-9.

[88] *Gibson v. Potter*, Civil Action No. 05-1942, 2007 WL 1428630, *3 (E.D. La. May 10, 2007).  *See also, Hickingbottom v. UNICCO Government Services, Inc.*, Civil Action No. 10-894, 2010 WL 3720672, *4 (E.D. La. Sept. 13, 2010)(court considered allegations of sexual harassment preceding date plaintiff claimed alleged sexual harassment occurred because such acts were within the scope of a reasonable investigation of incident in EEOC Charge).

[89] *Holden v. Ill. Tool Works, Inc.*, Civil Action No. 06-2981, 2008 WL 183334, *7 (S.D. Tex. Jan. 18, 2008).

[90] 42 U.S.C. § 2000e-5(e)(1).

filing period is extended to 300 days.[91]   Generally, a plaintiff can only recover for acts occurring within the 300 days preceding the filing of the EEOC Charge, unless the continuing violation doctrine or some other equitable doctrine applies to toll or extend the prescription period.[92]   The continuing violation doctrine "generally applies to hostile work environment claims, as opposed to intentional acts of discrimination, like demotion or failure to promote."[93]

In this case, Tucker should only be able to recover for acts occurring within the 300 days preceding January 29, 2015—or after April 5, 2014.   Tucker contends that the typical 300 day limitation period is inapplicable in this case under the continuing violation doctrine.  "The continuing violation theory relieves a plaintiff of establishing that all of the complained-of conduct occurred within the applicable period if the plaintiff can show a series of related acts, one or more of which falls within the limitations period."[94]  "The continuing violation doctrine is designed to 'accommodate plaintiffs who can show that there has been a pattern or policy of discrimination continuing from outside the limitations period into the statutory limitations period, so that all discriminatory acts committed as part of this pattern or policy can be considered timely.'"[95]

However, the continuing violation theory is limited:

First, the plaintiff must demonstrate that the "separate acts" are related, or else there is no single violation that encompasses the earlier acts.  Second, the violation must be continuing; intervening action by the employer, among other things, will sever the acts that preceded it from those subsequent to it, precluding liability for preceding acts outside the filing window.  Third, the continuing violation doctrine is tempered by the court's equitable powers,

---

[91] *See, e.g., Montgomery-Smith v. La. Dep't. of Health and Hospitals*, Civil Action No. 15-6369,  2017 WL 679536, *7 (E.D. La. Feb. 21, 2017).
[92] *See Numa v. Cannizzaro*, Civil Action No. 13-515, 2014 WL 1329829, *8 (E.D. La. Mar. 31, 2014).
[93] *Vann v. Mattress Firm, Inc.*, Civil Action No. 12-3566, 2014 WL 4677459, *4 (S.D. Tex. Sept. 18, 2014)
[94] *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 351 (5th Cir. 2001)(citing *Messer v. Meno*, 130 F,3d 130, 135 (5th Cir. 1997)).
[95] *Id.* at 351-52 (quoting *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir. 1999)).

which must be exercised to "honor Title VII's remedial purpose 'without negating the particular purpose of the filing requirement.'"[96]

Although Tucker bears the burden of demonstrating that these separate acts are related to those that occurred within the 300 day time period, she offers only conclusory argument that all of the claims involve the same type of harassment, were committed by the same person, and it would honor Title VII's remedial purpose to apply the continuing violation theory in this case.[97]

Tucker points to two alleged acts of sexual harassment attributable to McCaleb that occurred within the 300 day filing period. In June of 2014, McCaleb was allegedly hiding in the dark between two trailers and responded to Tucker's question directed to another employee; Tucker did not know that McCaleb was hiding there. On July 24, 2014, Tucker claims that McCaleb walked up behind her while she was unloading a package car and pushed his penis into her backside. Of these two incidents, the Court finds only that the July 24, 2014 incident is sexual in nature. As Tucker testified, other UPS employees, including car washers like McCaleb, would hide during work hours to

---

[96] *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 328 (5th Cir. 2009).

[97] Tucker also argued that the untimely harassing acts lacked the degree of permanence that would have put her on notice that she needed to assert her rights. In *Celestine v. Petroleos de Venezuella SA*, (*Celestine I*), 266 F.3d 343 (5th Cir. 2001), the Fifth Circuit identified the following three factors to consider in determining if a continuing violation existed: (1) Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? (2) Are the alleged acts recurring or more in the nature of an isolated work assignment or incident? (3) Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights?" (*Id.* at 352). In its recent opinion, *Heath v. Bd. of Supervisors for Southern Univ. and Agricultural and Mechanical College*, 850 F.3d 731 (5th Cir. 2017), the Fifth Circuit recognized that the Supreme Court decision, *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), expressly overruled its "prior cases to the extent they held that the continuing violation doctrine does not apply when an employee was or should have been aware of a duty to assert her rights." *Id.* at 739. In accordance with *Heath*, the third factor from *Celestine I* should no longer be considered by courts when assessing the applicability of the continuing violation theory/doctrine.

avoid performing work.[98]  Further, Tucker has offered nothing to support her contention that such behavior was sexual in nature.

With the exception of the July 24, 2014 incident, Tucker has identified several alleged sexual acts committed by McCaleb between August of 2012 and November of 2013 that should be considered in support of her sexual harassment claim.   The Court construes the following as the other alleged incidents of harassment: (1) August 2012: McCaleb watched Tucker make copies and started laughing and smiling seductively at her;[99] (2) August 2012:  McCaleb told Tucker that she smelled "so good. [He] could smell her a mile away."; (3) September 2012: Tucker walked by McCaleb and he told her she was so hot, and she did not know the things he would do to her;[100] (4) September 2012: McCaleb hid behind cars, trailers, walls, or packages, and jumped out toward Tucker, startling her;[101] (5) September 2012: on one instance when McCaleb jumped out from where he was hiding, he asked Tucker if she was scared.  "When she responded yes, he told her that she did not have to be afraid because he would take [his] time … 'with her and do her right.'"[102]; (6) November 2012:  While Tucker was sitting in the office, McCaleb came into the office and stared at Tucker in a seductive manner.  When Tucker asked him to leave he started laughing;[103] (7) February 2013:  McCaleb told Tucker "that he had a new house with a large bedroom and big bed, and the bedroom had a fireplace but they wouldn't need it because he would keep her warm;"[104] (8) April 2013:  McCaleb asked Tucker how she was doing.  She responded that she was fine.  McCaleb said, "Oh, yeah,

[98] Doc. 33-2, p. 133.
[99] Doc. 33-2, p. 123.
[100] Doc. 33-2, p. 125.
[101] Doc. 33-2, pp. 125-26.
[102] Doc. 33-2, p. 126.
[103] Doc. 33-2, p. 127.
[104] Doc. 33-2, p. 128.

I can see that" and watched her as she walked into her office;[105] (9) May 2013:  while Tucker was in the paper room getting some paper, McCaleb, who was standing in the doorway, asked Tucker if she needed him to get the paper.  "When she politely declined his help, he pulled some cash from his pocket and said he would pay for it;"[106] (10) September 2013: McCaleb was driving the package car and accelerated toward Tucker, who was five months pregnant, and then slammed on the brakes approximately two feet from Tucker.  When she asked him to never do that again, he laughed and walked away;[107] (11) November 2013: when Tucker asked McCaleb to perform a work duty he responded "Oh, you know what I want to do.  I want to put my tongue down your throat";[108] and (12) November 18, 2013:  while Tucker was leaning against the rear of a package car, McCaleb got into the truck, quickly started the ignition, and sped off.  Tucker, who was pregnant, "hardly had a chance to get off the truck."[109]  Tucker also testified that sometimes McCaleb would refer to her as "my Shelita."[110]

Initially, the Court finds that not all of these actions are sexual in nature.  The September 2013 and November 2013 incidents concern McCaleb's operation of UPS package trucks.  Further, as Tucker's email to her supervisors reporting McCaleb's poor driving clearly relays, she was not the only one who had experienced and complained about McCaleb's behavior.[111]  Once again, the Court does not find McCaleb's hiding behind trailers, walls, and packages, and jumping out and scaring Tucker to be sexual in nature.  The Court also finds that McCaleb's alleged statement regarding payment in the

---

[105] Doc. 33-2, p. 129.
[106] Doc. 33-2, p. 129.
[107] Doc. 33-2, p. 130.
[108] Doc. 33-2, p. 131.
[109] Doc. 33-2, p. 136.
[110] Doc. 24-3, pp. 14-15.
[111] Doc. 33-2, p. 136. ("It was only a couple of months ago Chris Howard complained of the same thing.").

paper room not to be sexual in nature, and that Tucker has not offered any evidence to show it could be construed as such.

Of the remaining allegations, the following appear to be sexual in nature: two instances in August of 2012 (smiling seductively at Tucker and McCaleb telling Tucker she smelled good); two instances in September of 2012 (statement regarding Tucker being hot and asking Tucker if she was scared); one instance in November of 2012 (staring at Tucker in a seductive manner); one instance in February of 2013 (new house with fireplace); one instance in April of 2013 (Tucker doing fine); and one instance in November of 2013 (tongue comment).

Notably, the last untimely sexually triggered incident occurred in November of 2013. The next incident of a sexual nature did not occur until approximately eight months later, on July 24, 2014. Considering this eight month gap in time between the alleged incidents of sexual harassment, the July 24, 2014 incident appears to be more in the nature of a discrete act.[112] The Court is mindful of the fact that Tucker was out on maternity leave from December of 2013 until May of 2014.[113]

As for the second consideration, the Court must now determine whether the violation is continuing. In this case, Tucker admitted that she reported one of the incidents from September of 2012 to her supervisor—when McCaleb had jumped out and asked her if she was scared.[114] According to the undisputed evidence, Tucker's supervisor called McCaleb into his office and counseled him about his conduct.[115] Tucker

---

[112] *Johnson v. Flour Corporation*, 181 F.Supp. 3d 325, 336 (M.D.La. 2016).
[113] Doc. 24-3, p. 21.
[114] Doc. 33-2, p. 126.
[115] Tucker testified that her other full time supervisor Ron Letherman called Larry into his office and spoke to him about the incident. Doc. 33-2, p. 20. In her deposition, Tucker explained that her full-time supervisor was either Collins or Letherman.

explained that she was satisfied with how her supervisor handled the situation, and that she just wanted her supervisor to talk to McCaleb.[116]  Tucker's supervisor told her to come to him if she needed anything else.[117]   The Court finds that this intervening action by UPS severs the acts that preceded it from those subsequent to it.[118]   In other words, those actions from November 2012 through November of 2013 are still viable.

The Court's final consideration turns on equity.  The continuing violation theory is an equitable doctrine.   As previously stated, the continuing violation theory is tempered by the Court's equitable powers to "honor Title VII's remedial purpose 'without negating the particular purpose of the filing requirement.'"[119]   The Supreme Court has explained that doctrines such as the continuing violation theory "are to be applied sparingly."[120]  This is an unusual case.  The plaintiff employee in this case is a UPS Supervisor, who has asserted claims of sexual harassment against her subordinate.  As McCaleb's supervisor, Tucker admitted that she had the ability to discipline him, and yet, she failed to do so in connection with any of the alleged acts of sexual harassment in 2012 and 2013.   In this case, the Court agrees with the Defendant that it would not be equitable for Tucker, a supervisor who failed to discipline the offending employee, to be allowed to hold UPS liable for the 2012 and 2013 conduct under the continuing violation theory.

In light of the foregoing, the Court finds that the application of the continuing violation theory is not warranted in this case.   Nevertheless, even if the Court were to

---

[116] Doc. 33-2, p. 20.
[117] Doc. 33-2, p. 20.
[118] As to this incident, Tucker has offered no evidence to dispute that UPS took prompt remedial action to protect her and end the harassment.   "'When a company, once informed of allegations of sexual harassment, takes prompt remedial action to protect the claimant, the company may avoid Title VII liability.'" *Stewart*, 586 F.3d at 329. (quotations omitted).
[119] *Id.* at 328.
[120] *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

construe the four incidents from November of 2012 through November of 2013 in conjunction with the July 24, 2014 package car incident, Tucker's sexual harassment claim would still be dismissed.

C.    Does Tucker have a Viable Sexual Harassment Claim?

In order to establish a *prima facie* case of hostile work environment based on sexual harassment, Tucker must show that: (1) she belongs to a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment affected a term, condition, or privilege of her employment; and (5) her employer either knew or should have known of the harassment and failed to take remedial action.[121]

It is undisputed that Tucker belongs to a protected class.  UPS assumes without conceding strictly for the purpose of this *Motion*, that Tucker was subjected to unwelcome sexual harassment.   UPS argues that because Tucker cannot satisfy the third, fourth, and fifth elements, her sexual harassment claim must be dismissed.   Because the Court finds merit in UPS' arguments that the conduct was not sufficiently severe or pervasive and that UPS took prompt remedial action, the Court will not address whether Tucker can satisfy the third element.

i.    Was the Conduct Sever and Pervasive?

"Not all harassment will affect a term, condition, or privilege of employment."[122] The Supreme Court has long held that Title VII is not meant to be "a general civility code" for all workplace incidents that involve boorish behavior.[123]   For harassment to affect a

---

[121] *Cain v. Blackwell*, 246 F.3d 758, 760 (5th Cir. 2001).
[122] *Shepherd v. Comptroller of Pub. Accounts of Tex.*, 168 F.3d 871, 874 (5th Cir. 1999).
[123] *Faragher v. City of Baton Rouge,* 524 U.S. 775, 788 (1998).

term, condition or privilege of employment, it must be both objectively and subjectively abusive.[124] "A *prima facie* case of hostile work environment under Title VII requires a plaintiff to show that 'more than just a few isolated incidents of [sexual] enmity' occurred."[125] "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"[126] In determining whether an environment is objectively hostile or abusive, courts must consider the totality of the circumstances. "Although no single factor is required, courts look to (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating as opposed to a mere offensive utterance; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether the complained-of conduct undermines the plaintiff's workplace competence."[127]

The Court is in agreement with UPS that McCaleb's four sexually related incidents from November of 2012 through November of 2013[128] in conjunction with the one incident involving physical touching on July 24, 2014 are not sufficiently severe or pervasive. The Court finds that the instant case is very similar to the Fifth Circuit decision, *Gibson v. Potter*.[129]

---

[124] *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993).

[125] *Matherne v. Ruba Management,* Civ. Action Nos., 12-2461, 12-2462, 12-2584, 2014 WL 2938100, *4 (E.D. La. June 27, 2014)(quoting *Roberts v. Tex. Dep't of Human Servs.*, 275 F.3d 1083, 2001 WL 1468757, *2 (5th Cir. Oct. 31, 2001)).

[126] *Id.* (quoting *Faragher*, 524 U.S. at 788 (citation omitted)).

[127] *Hockman v. Westward Communications, LLC*, 407 F.3d 317, 325-26 (5th Cir. 2004).

[128] November 2012 incident (staring at Tucker in a seductive manner); one instance in February of 2013 (new house with fireplace); one instance in April of 2013 (Tucker doing fine); and one instance in November of 2013 (tongue comment).

[129] *Gibson v. Potter*, 264 Fed. App'x. 397 (5th Cir. 2008).

In *Gibson*, the plaintiff, Michele Gibson ("Gibson"), brought claims of sexual harassment against her employer, the United States Postal Service. Gibson's claims involved one instance of physical touching on January 14, 2004, when her supervisor, Andrew Lea ("Lea"), "grabbed her buttocks and made suggestive comments" while she was conversing with another employee.[130] She also alleged that between October of 2003 and January of 2004, Lea engaged in "sex talk" with her, asked her for dates, and offered his telephone number to her. The Fifth Circuit agreed with the district court's application of the law to the facts and quoted them as follows:

> Here, there is only one such instance [of unwanted physical conduct], and even considering [the] January 14, 2004, incident in the light of prior conduct, the alleged does not become objectively severe or pervasive. Here, [Gibson] never reported any prior incidents to her employer…Significantly, [Gibson] did not apprise the employer of the incidents that occurred before January 14, 2004, even after the January 14, 2004 incident….[131]

The Fifth Circuit explained how one nonconsensual physical touching that was promptly investigated, in conjunction with the "boorish and offensive" comments made by Lea did not rise to the level of severity or pervasiveness necessary to affect a term, condition, or privilege of employment. Affirming the district court's finding, the Fifth Circuit concluded that, viewing the totality of circumstances in the light most favorable to Gibson, no reasonable jury could find that Lea's conduct was sufficiently severe or pervasive to alter a term or condition of Gibson's employment.

As in *Gibson*, Tucker has only brought forth evidence of one incident of nonconsensual physical touching.[132] In that one instance, both Tucker and McCaleb were

---

[130] *Id.* at 398.
[131] *Id.* at 401.
[132] In other cases, courts have dismissed sexual harassment claims on Rule 12(b) grounds that involved more instances of body touching than Tucker asserts in the instant matter. *See McClinton v. Sam's East,*

fully clothed, and unlike the offender in *Gibson*, McCaleb made no suggestive comments when he pressed his penis into her backside.[133]  Also like the plaintiff in *Gibson*, Tucker failed to report any of the four other instances of alleged sexual comments and seductive staring to her supervisors.   Moreover, these four other instances involving McCaleb occurred over a 13 month span, with the last incident occurring eight months prior to the nonconsensual physical touching.   Construing the evidence in a light most favorable to Tucker, the Court finds that McCaleb's comments and staring amount to nothing more than the "'simple teasing,' offhand comments, and isolated incidents…[that] will not amount to discriminatory changes in the 'terms and conditions of employment.'"[134]  While certain statements made by McCaleb could be deemed "boorish and offensive," they do not rise to the level of severity or pervasiveness required by the law.

Accordingly, viewing the totality of circumstances in the light most favorable to Tucker, the Court finds that no reasonable jury would find that McCaleb's conduct was sufficiently severe or pervasive to alter a term or condition of Tucker's employment. Therefore, the Court finds that Tucker's sexual harassment claim should be dismissed on this ground.

---

*Inc.*, 2012 WL 4483492, *5 (W.D. La. Sept. 28, 2012)(male employee alleged seven instances of sexual harassment involving his female supervisor: "(1) an instance of 'body touching' reported on August 26, 2011; (2) [supervisor] touching his rear end in the cooler; (3) [supervisor] again touching his rear end in the cooler; (4) [supervisor] hugging [employee] in front of another manager; (5) [supervisor] wrapping her arms around [employee] and asserting the two would make 'a great team;' (6) [supervisor] again wrapping her arm around [employee] and referring to them as a team; and (7) [supervisor] dropping her pants to show her tattoo."  In *McClinton*, the district court explained, "[w]hile such occurrences, if proved, would certainly be impolite and rude, they do not create a hostile work environment.").

[133] The Court further observes that the Fifth Circuit has required more frequent occasions of offensive unwanted touching in order to support a claim of sexual harassment.  *See Harvill v. Westward Commc'ns, LLC*, 433 F.3d 428 (5th Cir. 2005)(behavior found to be sufficiently severe or pervasive where plaintiff subjected to unwanted touching of her breasts once or twice a week over a seven month period, in spite of her protestations).

[134] *Shephard v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999)(quoting *Faragher*, 524 U.S. at 786).

ii.    Should UPS Have Known of the Harassment and Failed to Take Prompt Remedial Action?

Even if the Court had found McCaleb's conduct to be severe or pervasive, which it does not, Tucker's claim would still fail on the fifth element.  Specifically, Tucker has failed to produce evidence that would lead a reasonable trier of fact to find that UPS either knew or should have known of the harassment and failed to take remedial action.   It is undisputed that Tucker made no complaints regarding the four incidents between November of 2012 and November 2013.  It is also undisputed that Tucker, as McCaleb's supervisor, had the authority to discipline; and yet, she took no disciplinary action against him on these four occasions.

While Tucker does not dispute that an investigation was conducted by UPS, she does criticize certain aspects of the investigation and UPS' ultimate decision.  Tucker contends that UPS should have interviewed Terry Burns, who Tucker immediately spoke to after leaving the package car on July 24, 2014.  However, Burns had no first hand evidence of what occurred between Tucker and McCaleb in the package car; witnesses, such as Burns, would only have been able to testify to what they heard about the incident from Tucker.[135]  Therefore, Edwards indicated that information from Burns would not have changed the outcome of the investigation.[136]   Tucker also contends that testimony of four female UPS employees who were interviewed as part of the investigation showed that McCaleb was a harasser of women.  However, as UPS correctly points out, McCaleb's alleged comments toward these women occurred on unknown dates and were not timely reported.   Moreover, none of these women reported any physical conduct by McCaleb.

---

[135] Doc. 33-6, pp. 28-29.
[136] Doc. 33-7, p. 25.

Although UPS was unable to find that McCaleb's physical contact with Tucker was intentional, McCaleb did experience adverse consequences for his actions. He was suspended for two weeks, counseled on UPS' policies, and instructed to stay away from Tucker's work area. On the one occasion that Tucker reported McCaleb near her work area, McCaleb was immediately disciplined. While Tucker complains that UPS should have transferred McCaleb to another facility, the evidence clearly shows that based on the investigative findings in conjunction with the Constructive Bargaining Agreement, UPS could not have forced McCaleb to transfer to another facility.[137]

The bottom line in this and any other sexual harassment case assessing whether an employer's response was appropriate is whether the remedial action is reasonably designed to end the harassing conduct.[138] In this case, McCaleb's harassing conduct ceased after UPS intervened. Specifically, after the investigation, McCaleb never spoke to or physically touched Tucker again. To the extent Tucker argues that McCaleb's October 2014 criminal conviction for simple battery should have spurred UPS to take additional disciplinary action against him, the law is established that an employer is not obligated to impose the most serious sanction available in response to harassing conduct.[139] Additionally, Tucker has not directed the Court to any authority that suggests that because a plaintiff independently pursues simple battery criminal charges against

---

[137] Doc. 24-2, pp. 16-16; Doc. 33-7, pp. 21-22.

[138] *See Skidmore v. Precision Painting & Pkg., Inc.*, 188 F.3d 606, 616 (5th Cir. 1999)(where employer did not conduct investigation until after EEOC Charge filed, court found prompt remedial action had occurred because employer reprimanded and relocated harasser, even though plaintiff still felt uncomfortable because he leered at her on one occasion and was in the common work area at the same time she was). In this case, when Tucker reported McCaleb for being near her work area, McCaleb was immediately reprimanded.

[139] *See Kreamer v. Henry's Towing* 150 Fed. App'x 378, 382 (5th Cir. 2005)("an employer need not impose the most severe punishment to comply with Title VII.")

her harasser, her employer's legal burden is altered under Title VII.[140]  Accordingly, the Court finds that Tucker has failed to produce evidence that would create a genuine dispute of fact that would lead a reasonable juror to find that UPS knew or should have known of the harassing conduct and failed to take prompt remedial action. Therefore, Tucker's claim for sexual harassment also fails on this element.

       D.     Was Tucker Constructively Discharged?

To demonstrate constructive discharge, a plaintiff must prove that "working conditions [were] so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."[141]  Factors that a court may consider include: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; and (6) offers of early retirement or continued employment on terms less favorable than the employee's former status.[142] Although "[p]roof is not required that the employer imposed these intolerable working conditions with the specific intent to force the employee to resign,"[143] proof of constructive discharge requires a greater degree of harassment than required by a hostile environment claim.[144]

Tucker claimed that she was compelled to quit her position because UPS "forced her to work on the same shift as the man who violated her."[145]  Specifically, she claimed that the work environment following the July 24, 2014 incident was hostile because she

---

[140] The Court has also been unable to find any Fifth Circuit jurisprudence that supports such a position.
[141] *Bourque v. Powell Electrical Mfg. Co.*, 617 F.2d 61, 65 (5th Cir. 1980).
[142] *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).
[143] *Jurgens v. Equal Employment Opportunity Commission*, 903 F.2d 386, 390-91 (5th Cir. 1990).
[144] *Hockman v. Westard Comm.,* 407 F.3d 317, 322 (5th Cir. 2004).
[145] Doc. 1, p. 6, ¶12.

"[had] to endure sitting, standing walking past [McCaleb]" and "[h]aving people look at [her], [her] employees," and that McCaleb stared at her from package cars.[146] In order to support her claim of constructive discharge, Tucker's claims require a greater degree of harassment than required for a hostile work environment claim. Construing the evidence in the light most favorable to Tucker, the Court finds that she cannot satisfy her burden.

For instance, in *Wilkinson v. Potter*,[147] the plaintiff claimed that her harasser engaged in the following activity: "(1) short, almost daily periods where [co-worker harasser] stared at her; (2) unnecessary appearances by [co-worker harasser] in her work area; (3) instances where [co-worker harasser] would follow her as she went to replace full mailbags with empty ones; (4) an instance where [co-worker harasser] did not back up to allow the plaintiff and her friend to pass, and then touched the plaintiff on her arm; and (5) an instance where [co-worker harasser] shook a rod in the plaintiff's direction for a few seconds."[148] The co-worker harasser also never attempted to speak to the plaintiff in *Wilkinson*. Ultimately, the Fifth Circuit affirmed the district court's finding that such conduct was not so "severe and pervasive" to prevent the employee from succeeding in the workplace. Here, Tucker's claims subsequent to the July 24, 2014 incident involve similar conduct as that in *Wilkinson*. Tucker's complaints consisted of McCaleb leering or staring at her, and having to walk past McCaleb when she entered and left the UPS facility. Accordingly, the Court finds that Tucker's claims fail to support a hostile work environment claim, and, in effect, fail to support a constructive discharge claim which requires a higher degree harassment.

---

[146] Doc. 24-2, pp. 39-40.
[147] *Wilkinson v. Potter*, 236 Fed. App'x 892 (5th Cir. 2007).
[148] *Id.* at 893.

Tucker also attempts to support her constructive discharge claim by arguing that she was moved around to various jobs at the UPS facility which made performing her job difficult. Tucker further argues that she received a written reprimand for calling into work sick the night of McCaleb's criminal trial. She claims that even after McCaleb was found guilty of criminal simple battery, UPS did nothing to stop his harassment.

A review of the evidence in this case presents a different picture. UPS moved Tucker around to various areas in the facility to accommodate her requests to be away from McCaleb.[149] She further testified that up until October 30, 2014, her last day of physically working at the UPS facility, she was able to perform her job duties.[150] While it is true that Tucker received a written reprimand for calling into work sick, she testified that she experienced no adverse employment action for this incident.[151]

The totality of the evidence also contradicts Tucker's argument that "UPS did nothing to stop [McCaleb's] harassment."[152] In response to the July 24, 2014 incident, McCaleb was suspended without pay for two weeks, counseled on UPS' internal policies regarding workplace professionalism, intimidation, and harassment in the workplace, and instructed to stay away from Tucker's work area.[153] When Tucker contacted her supervisors about McCaleb being near her work area, McCaleb was immediately reprimanded and did not return to Tucker's work space. While Tucker included her concerns about McCaleb's staring at her and placing himself in a position where she would have to walk past him when she entered and left the building in an October 30,

---

[149] *See supra* notes 56 and 58.
[150] Doc. 24-2, p. 40. Tucker further explained that she just "wasn't [herself]… [she] felt empty."
[151] Doc. 33-2, pp. 106-110; pp. 148-49.
[152] Doc. 33, p. 18.
[153] Doc. 24-12, pp. 18 and 22; Doc. 24-10, p. 19; Doc. 24-11, pp. 13, 20, 22, and 27. As has been discussed already in this *Ruling*, McCaleb had to file a grievance to be compensated for the two weeks he was suspended from work without pay.

2014 email, it is undisputed that she never returned to work to consider how Edwards would address these additional concerns.[154]  Moreover, the evidence shows that after the July 24, 2014 incident, McCaleb never spoke to Tucker again or had any physical contact with her.

Based on the foregoing, the Court finds that Tucker has failed to show that working conditions were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.  Accordingly, her constructive discharge claim must be dismissed.

E.    Tucker's Retaliation Claim

In the Fifth Circuit, to set forth a *prima facie* case of retaliation a plaintiff must show: "(1) that she participated in a Title VII protected activity; (2) she suffered an adverse employment action by her employer, and (3) there is a causal connection between the protected activity and the adverse action."[155]

As the Fifth Circuit recently explained, "[i]n retaliation claims, the plaintiff must ultimately show that the protected activity is the 'but for' cause of the adverse employment action."[156]  With respect to whether a plaintiff has suffered an adverse employment action by her employer, for such an employment action to constitute prohibited discrimination, the action must be "materially adverse," meaning that it would "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination."[157]  Recently, another federal court in Louisiana explained what qualifies as a material adverse action:

---

[154] Doc. 33-2, p. 153.
[155] *Stewart*, 586 F.3d at 331.
[156] *Claiborne v. Recovery School District*, Civil Action No. 16-30667, 2017 WL 2480724, *8 (5th Cir. June 7, 2017).
[157] *Stewart*, 586 F.3d at 331.

In *Stewart*, for example, the Fifth Circuit determined that, as a matter of law, having personal items taken from your desk, having the locks on your office door changed and being chastised by superiors and ostracized by co-workers 'do not rise to the level of material adversity but instead fall into the category of 'petty slights, minor annoyances, and simple lack of good manners' that the Supreme Court has recognized are not actionable retaliatory conduct. However, employer actions such as demotion, denial of a pay increase, and failure to promote, are materially adverse employment actions. The Fifth Circuit has also noted that the imposition of a heavier workload may constitute an adverse employment action. 'Whether a particular reassignment is materially adverse depends on the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all circumstances.[158]

It is undisputed that Tucker's July 24, 2014 internal complaint to the UPS Compliance Line and subsequent complaints to UPS' human resources department and her supervisors were protected activities.[159] The points of contention are whether Tucker can satisfy the second and third elements of her *prima facie* claim.[160] For the following reasons, the Court agrees with UPS.

Tucker contends that the following three actions were adverse employment actions: completing a write-up for attendance; a co-worker playing with a stapler and a second employee saying they were going to report it, and Center Manager Williams laughing and saying that "you don't have any witnesses"; and Tucker being moved around to different areas in the UPS facility. In spite of Tucker's argument otherwise, Fifth Circuit jurisprudence and the record evidence prove that these three instances do not amount to adverse employment actions.

---

[158] *Montgomery-Smith v. Louisiana Dept. of Health and Hospitals*, Civil Action No. 15-6369, 2017 WL 679536, *9 (E.D.La. May 22, 2017)(quotations and citations omitted).

[159] Doc. 24-8, pp. 8 and 11; Doc. 24-8, p. 10 (August 12, 2014 email from Tucker to Edwards about being afraid of McCaleb and being uncomfortable working around him); Doc. 24-9, p. 5 (August 26, 2014 email from Tucker to Collins about being in a hostile work environment due to McCaleb's presence in the facility.).

[160] If Tucker had been able to establish a prima facia case of retaliation, then the burden would have shifted to UPS to state a legitimate, non-retaliatory reasons for the employment action taken. See, *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013).

First, concerning Tucker's write-up, as has been previously discussed in this *Ruling*, Tucker admitted that she did not suffer any adverse consequences as a result of this write-up. Further, in *DeHart v. Baker Hughes Oilfield Operations, Inc.*,[161] the court found that a written warning for insubordination, being argumentative, and excessive absenteeism did not amount to adverse employment action because there were "colorable grounds" for the issuance of the warning. In Tucker's case, she admitted that she had not shown up for work, and that she did not suffer any adverse consequences as a result of the write-up.[162] Hence, UPS' action of requiring a write-up was justified under the circumstances.[163]

As for the second incident, while Tucker perceived the action as being related to the McCaleb incident, she admitted in her deposition testimony that no one linked Williams' statement to her or the July 24 incident.[164] She testified that no one was speaking directly to her about the lack of witnesses, and that no one tied the statement to her incident with McCaleb.[165] Tucker's claim was admittedly based on how the discussion made her feel at the time.[166] The Court finds that while Williams' statement may have been inappropriate and perhaps insensitive, it did not amount to an adverse employment action. Rather, the statement would fall into the category of "petty slights,

---

[161] 214 Fed. App'x 437, 442 (5th Cir. 2007).
[162] Doc. 33-2, pp. 106-110; pp. 148-49.
[163] Tucker further acknowledged having received similar write-ups before the July 24, 2014 incident. Doc. 33-2, p. 117. ("And you had also had to do write-ups for your attendance prior to the incident with [McCaleb]; is that right? Yeah, I'm sure in my tenure there, I've had to do write-ups on my attendance before.")
[164] Doc. 33-2, pp. 118-119.
[165] *Id.*
[166] *Id.* (Tucker "felt that [Darin Williams] was making fun of [her] because that was the thing, [she] didn't have any witnesses.").

minor annoyances, and simple lack of good manners" which are not actionable retaliatory conduct.[167]

As for Tucker's relocation to different areas of the UPS facility, when the context of the relocations is considered, it is clear that UPS' actions were not materially adverse. The Court finds that the evidence in this case establishes that UPS management only moved Tucker in response to her concerns about McCaleb in order to make her feel more comfortable in her work setting.[168]   Accordingly, Tucker has failed to create a genuine dispute of fact that UPS' actions would have been materially adverse to a reasonable employee.

Tucker has also failed to establish a causal connection between UPS' alleged conduct and the internal complaints she filed about McCaleb.  Again the overwhelming evidence in this case shows that UPS attempted to accommodate Tucker and make her comfortable in her working environment.   In response to Tucker's complaints about McCaleb, Collins restructured work assignments, assigned everyone to a specific area, and placed Tucker in the outbound area where she would be least likely to encounter McCaleb.[169]  Tucker also testified that Williams gave Tucker her personal phone number to call in the event she needed anything.[170]   Even more importantly, Tucker testified that she had no problems with the individuals in UPS management who were addressing her concerns and situation.[171]   Tucker has offered no evidence showing that anyone in management ever made a negative comment to her for filing her internal complaints

---

[167] *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).
[168] Doc. 33-2, pp. 89-91.
[169] *Id.*
[170] Doc. 24-2, p. 19.
[171] Doc. 24-1, p. 5 (Tucker testified that she had "[n]o major problems" with Shraya Williams); p. 12 (Tucker testified that she never had any problems with her supervisors, Collins or Letherman); p. 20 (Tucker also testified that she had a "good relationship" with Edwards, and that she had no problems with him).

against McCaleb.[172]  For these reasons, and those additional reasons set forth in UPS's memorandum in support of summary judgment and its reply brief, the Court finds that Tucker has failed to demonstrate that a genuine dispute of fact exists as to whether UPS' actions were taken because of Tucker's participation in protected activity.  Accordingly, Tucker's retaliation claim must fail.

F.    Punitive Damages

Considering that the Court has found that all of Tucker's claims must fail on summary judgment, Tucker is not entitled to punitive damages under Title VII.[173]

## IV.    CONCLUSION

Accordingly, the foregoing reasons, the *Motion for Summary Judgment*[174] filed by Defendant United Parcel Service, Inc., is hereby GRANTED and Plaintiff Shelita Tucker's federal and state claims of sexual harassment, retaliation, and constructive discharge are hereby dismissed with prejudice.

Signed in Baton Rouge, Louisiana, on June 15, 2017

_____
**JUDGE JAMES J. BRADY
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**

---

[172] The evidence in the record seems to indicate that no one ever made any negative comments to her for bringing her complaints against McCaleb. *See* Doc. 24-3, p. 9 (Tucker testified that drivers would come up to her and let her know that they supported her and to see how she was doing).

[173] *Carpenter v. Miss. Valley State Univ.*, 807 F.Supp.2d 570, 598 (N.D. Miss. 2011)( "A plaintiff who **prevails on his Title VII claim may recover punitive damages** if he makes the required showing.") (emphasis added).

[174] Doc. 24.